## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| *SHELBY BRIGGS,* | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| *v.* | ) | *No. 2:16-cv-00374-JDL* |
| | ) | |
| *CITY OF PORTLAND,* | ) | |
| | ) | |
| *Defendant* | ) | |

### RECOMMENDED DECISION ON DEFENDANT'S MOTION TO DISMISS

Defendant, the City of Portland, moves pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss Counts I through VI of the complaint of plaintiff, Shelby Briggs, a City Community Health Promotion Specialist from January 2011 to June 2016, alleging gender discrimination (Counts I and II), retaliation (Counts III and IV), a violation of the Maine Whistleblowers' Protection Act (Count V), and a violation of 42 U.S.C. § 1983 (Count VI). *See* Defendant's Motion to Dismiss Counts I through VI of Plaintiff's Complaint ("Motion") (ECF No. 5) at 1. For the reasons that follow, I recommend that the Motion be denied.

### I.  Applicable Legal Standards

The Supreme Court has stated:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level.

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations and internal punctuation omitted). This standard requires the pleading of "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In ruling on a motion to dismiss under Rule 12(b)(6), a court assumes the truth of all of the well-pleaded facts in the complaint and draws all reasonable inferences in favor of the plaintiff. *Román-Oliveras v. Puerto Rico Elec. Power Auth.*, 655 F.3d 43, 45 (1st Cir. 2011). Ordinarily, in weighing a Rule 12(b)(6) motion, "a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001). "There is, however, a narrow exception for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Id.* (citation and internal quotation marks omitted).

## II. Factual Background

The complaint sets forth the following relevant factual allegations.[1]

Plaintiff Shelby Briggs worked for the City of Portland's Department of Health and Human Services as a Community Health Promotion Specialist from January 2011 until June 2016. Plaintiff's Complaint and Demand for Jury Trial ("Complaint") (ECF No. 1) ¶ 11. In that capacity, in 2013, she first encountered an individual referred to by the parties as "SL." *Id.* at ¶¶ 13-14. SL, who's legal name is Simon Langdon, and who went by "Kat" at the time of these events, was a transgender man transitioning to a woman. Motion ¶ at 1.

---

[1] The First Circuit has instructed that, in reviewing a complaint for sufficiency pursuant to Rule 12(b)(6), a court "should begin by identifying and disregarding statements in the complaint that merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action." *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011) (citation and internal punctuation omitted). "Non-conclusory factual allegations in the complaint must then be treated as true, even if seemingly incredible." *Id.* "If that factual content, so taken, allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged, the claim has facial plausibility." *Id.* (citation and internal quotation marks omitted).

On September 10, 2013, the plaintiff began facilitating a re-entry and recovery program at the Portland Recovery Community Center ("PRCC"). Complaint, ¶ 13. SL entered the room and took a seat directly next to the plaintiff and began to make comments indicating that SL knew the names of the plaintiff's partner and daughter, and referred to the plaintiff's daughter as "hot." *Id*. ¶¶ 14, 15. The plaintiff told SL that such comments were inappropriate. *Id*. ¶ 16. SL continued speaking with the plaintiff and made a string of offensive comments, including saying that the plaintiff reminded SL of a counselor SL had in prison who was "a lying cunt"; referring to SL's sex offender conviction as "a victimless crime"; talking about a 10-year prison sentence in Florida and mentioning both that SL had sex with other inmates and the insertion of various items into SL's rectum; saying that SL was a member of the street gang the Latin Kings; recounting SL inserting items in SL's rectum for the sake of SL's prison counselor; and, bragging about SL's ability to fit various items, including cell phones and knives, into SL's rectum. *Id*. ¶¶ 17, 19.

SL's admission about being a sex offender caused one member of the group to get up and leave, and following SL's description of SL's prison experience, caused the plaintiff to end the meeting. *Id*. ¶¶ 18, 20. SL's admission about being a sex offender was troubling because the PRCC prohibits sex offenders because it also hosts programs for youth. *Id*. ¶ 18. Further, although the meeting was a substance abuse recovery group, SL did not mention any substance abuse issues. *Id.* ¶ 19.

Immediately after the meeting, the plaintiff returned home and encountered her partner Chris, who informed her that SL had just sent him a series of messages through Facebook. *Id*. ¶ 21. The plaintiff looked at the pictures on the profile of the person contacting Chris and confirmed that SL was the same person whom she had just met at the meeting. *Id*. ¶ 22. The plaintiff then

checked her own Facebook account and discovered that she too had been sent a "Friend Request" from SL, and immediately blocked SL from being able to view her Facebook page.  *Id.* ¶ 23.

On the following day, September 11, 2013, the plaintiff informed her supervisors by email of the previous day's events.  *Id.* ¶ 24.  At a meeting with her supervisors the next day, the plaintiff's supervisor Bethany Sanborn told her that the supervisors could not ban sex offenders from attending PRCC's group sessions, and that the plaintiff should "take her emotion out of it." *Id.* ¶¶ 25, 27.  The plaintiff reminded Sanborn that both women and children attended programming at the PRCC, to which Sanborn replied that the issue was one for PRCC's director, and instructed the plaintiff to address the issue to him.  *Id.* ¶¶ 28 - 29.

Shortly thereafter, the plaintiff's other supervisor arrived, and the plaintiff updated her on her encounter with SL.  *Id.* ¶ 30.  Together, they met with the PRCC's director and management who agreed that SL would not be permitted at the PRCC because of the PRCC's preexisting ban on sex offenders.  *Id.* ¶ 31.  The plaintiff then asked Sanborn to inform partner organizations who did similar work to be aware of SL's presence at their meetings.  *Id.* ¶ 32.  Sanborn responded that she would need to speak with legal counsel but would get back to the plaintiff.  *Id.*  That afternoon, the plaintiff received a call from a co-worker expressing her outrage that the City was not offering the plaintiff any support or assistance after the plaintiff had reported harassment by SL.  *Id.* ¶ 35.

Later that day, around 4 p.m., Sanborn contacted the plaintiff and asked her not to notify partner agencies regarding the SL incident, citing her conversation with an attorney who works at the police station, and stated that the plaintiff could call the police the following day and inform the police of the situation.  *Id.* ¶ 36.

In addition to running certain meetings for the City of Portland, the plaintiff also attended a support group not affiliated with the City in her personal capacity.  *Id.* ¶ 37.   At one of these

personal group meetings a few weeks prior to September 11, 2013, the plaintiff recalled seeing SL, and also recalled seeing SL sitting next to a mother and her young children and playing with the children. *Id*. That evening, she privately contacted friends who attended this support group via Facebook, and informed them of SL's sex offender status, including a link to SL's publicly-available sex offender registration information. *Id*. In the message, she asked those she contacted not to inform SL that she had contacted them. *Id*. She did not contact members of any groups for which she worked in her capacity as an employee of the City of Portland. *Id*. On September 13, 2013, the plaintiff contacted a child sex crimes detective and conveyed the information that Sanborn had asked her to convey about the SL incident. *Id*. ¶ 40.

On September 13, 2013, the plaintiff was contacted by the PRCC and informed that SL had contacted the PRCC and had seen the plaintiff's private Facebook message of the night before. *Id*. ¶ 41. That same day, SL filed a complaint at the plaintiff's place of work stating that she "broke [their] confidentiality." *Id*. ¶ 43. SL posted on a public recovery discussion site that SL had met with the director of the India Street Public Health Clinic and the director had told SL that the plaintiff would be fired. *Id*. ¶ 45.

There was no confidentiality agreement at the group that both the plaintiff and SL attended, the mothers that she contacted had also seen SL at the group meeting, and the information that she disseminated about SL's sex offender status was publicly available. *Id*. ¶ 44.

On the afternoon of September 13, the plaintiff was contacted by Sanborn, who informed her that she was being placed on paid administrative leave pending an investigation into the plaintiff's alleged "breach of confidentiality." *Id*. ¶ 46. The plaintiff relayed to Sanborn that she was afraid of SL; that SL was desperately trying to get her contact information; that SL was stalking her; and that it was clear that SL had been thinking about her for much longer than she

realized.  *Id*. ¶¶ 46, 47.  Friends began to alert the plaintiff that SL was requesting her personal information.  *Id*. ¶ 49.

On September 16, 2013, the plaintiff spoke with Carol Young, the City of Portland's Employee Assistance Program therapist, who encouraged the plaintiff to obtain an order of protection against SL.  *Id*. ¶ 52.  The following day, after being informed by another person that SL had made another attempt to get in contact with her and had made threatening remarks, the plaintiff filed a report with the Westbrook Police Department.  *Id*. ¶ 53.

SL made a public post on Facebook which stated, *inter alia*, "dont fuck with the kat . . . anyone who knows her plz give me her # or call her and tell her to call me.  she made a big fuck up."  *Id*. ¶ 54.  The post also included SL's full name and telephone number.  *Id*.

The plaintiff filed for, and was granted, an order of protection on September 18, 2013, baring SL from harassing or stalking her, and a copy was provided to City of Portland management. *Id*. ¶ 55.

The plaintiff contacted her union representative and requested that he inform the City about the order of protection.  *Id*. ¶ 56.  Her union representative contacted the City's Director of Human Resources about the SL incident and subsequent events.  The City took no action to help or protect the plaintiff in response.  *Id*.

On September 19, 2013, the City convened a hearing regarding the plaintiff's suspension, where Sanborn stated that after her investigation, she had determined that the plaintiff had violated her confidentiality agreement.  *Id*. ¶ 60.  At the hearing, the plaintiff reiterated her version of events, her defense that she breached no confidentiality agreement, and that she feared for her life and the safety of her children. *Id*. ¶¶ 62-63.  Sanborn told the plaintiff that she would be informed

of the results of the investigation, and if she would be terminated, by September 27, 2013. *Id*. ¶ 64.

On September 20, 2013, a friend of the plaintiff informed the plaintiff that SL had created a second Facebook profile, on which SL had uploaded four pictures of the plaintiff's daughter. *Id*. ¶ 65. These photographs were uploaded two days after SL was served with the plaintiff's order of protection. *Id*. An investigation by the Westbrook Police Department followed. *Id*. ¶ 66. On September 24, 2013, the plaintiff's daughter received an order of protection against SL. *Id*. ¶ 71.

On September 23, the plaintiff's partner received a Facebook message from SL stating: "at one time witches were hung at the stake due to gov. ideas, and millions of jews, blacks and homosexuals were murdered by the ss and the germen public did nothing about it. i am being tryed and sentenced without you understanding any of the sercomstances." *Id*. ¶ 68. Another police investigation ensued. *Id*. ¶ 69. On September 25, 2013, the plaintiff contacted her managers to update them on the orders of protection and SL's continued course of conduct. *Id*. ¶ 72. She received no reply. *Id*.

On September 26, 2013, a neighborhood child informed the plaintiff that someone matching SL's description had been staring at the plaintiff's home. *Id*. ¶77. The plaintiff called the police. *Id*.

On September 30, 2013, the plaintiff and her family went to court to obtain a long-term order of protection against SL. *Id*. ¶ 78. While there, SL stood close to the plaintiff and her family, and SL testified that SL had sent photographs of the plaintiff's daughter to inmates in Florida. *Id*. The plaintiff again emailed her managers with a narrative of these events and received no response. *Id*.

On October 10, 2013, the City, through the plaintiff's union, presented an offer of pay and benefits to the plaintiff in exchange for her resignation. *Id.* ¶ 79. A hearing was held on October 21, 2013. *Id.* There, the plaintiff reiterated her fear of SL, while a manager stated that dealing with the client population that includes SL was part of the plaintiff's position. *Id.* ¶¶ 81, 83. The following day, the plaintiff sent a formal complaint to the City about being sexually harassed by SL, and asserting that her direct supervisors were now retaliating against her for making those complaints. *Id.* ¶ 84. She received no reply. *Id.*

On October 26, 2013, SL appeared at the plaintiff's house on two different occasions. *Id.* ¶ 85. SL was arrested later that day, and the plaintiff emailed Sanborn with an update. *Id.* ¶ 87. She did not receive a reply. *Id.* The Westbrook Police Department installed an alarm system in the plaintiff's home on November 1, 2013, to dispatch police immediately to the plaintiff's house if activated. *Id.* ¶ 89.

A few weeks later, the plaintiff was contacted by an investigator who was looking into the plaintiff's original complaint against SL regarding the events of September 10, 2013. *Id.* ¶ 91. The plaintiff remained on administrative leave in January 2014. *Id.* ¶ 93. On January 7, she filed with City management a list of requests to ensure her safety at work and protection from SL. *Id.* ¶ 94. Eventually, the city and the plaintiff's union agreed to impose a two-week unpaid suspension on the plaintiff as punishment for her contact with the members of her non-work-related group regarding SL. *Id.* ¶ 96. The plaintiff returned to work on January 29, 2014. *Id.* ¶ 97. At a meeting regarding her return to work, the plaintiff expressed her ongoing concern with her safety at work because of SL's behavior, and requested that the City ban SL from receiving city services at locations where the plaintiff worked. *Id.* ¶¶ 97-99. City management did not agree with her request. *Id.*

Over the coming months, the City did institute a protection plan for the plaintiff, but it did not include banning SL from locations where the plaintiff worked. *Id.* ¶ 102. Under the plan, the City agreed to call 911 if the need arose. *Id.* While she had been scheduled to gain an extra 7.5 hours of work per week at the City's India Street Clinic, this plan was cancelled because SL attended the facility. *Id.* ¶ 104.

In early February 2014, the City banned a man from the grounds of City Hall after he posted on Facebook that he demanded that the Mayor and City Manager speak with him. *Id.* ¶ 101. Both the Mayor and the City Manager were men. *Id.*

In April 2014, the plaintiff did not receive a promotion to the position of Substance Abuse Prevention Program Coordinator; the job was given to a male with no experience with the specific requirements of the job. *Id.* ¶ 105. The plaintiff reported to Sanborn on May 12, 2014, that she felt the City was retaliating against her. *Id.* ¶ 106. In June of 2014, during the production of brochures for a City program, Sanborn said that it would be inappropriate for the plaintiff to be in pictures taken for the brochure because she would not always be working there. *Id.* ¶ 108.

On July 14, 2014, SL approached the plaintiff at a public event while the plaintiff was working, and smiled and winked at her, and walked around her in a circle. *Id.* ¶ 109. The plaintiff reported this to Sanborn and the police. *Id.* The following day, she met with City officials to further address SL's behavior. The City again refused to ban SL from City programs or facilities. *Id.* ¶ 110. Later in the month, the plaintiff went to court to seek an extended order of protection against SL. *Id.* ¶111. The City provided two witnesses on SL's behalf, the plaintiff's managers, who sat with SL before the proceeding. *Id.*

On September 5, 2014, SL approached the plaintiff and her family at a public event in Portland. *Id.* ¶113. SL was arrested and later released on bail. *Id.* On September 24, 2014, the

plaintiff was told by a co-worker that SL had been seen outside of City Hall, where the plaintiff's office was located.  *Id*. ¶114.  On September 25, 2014, the plaintiff learned that Sanborn had seen SL outside of City Hall the previous week, but had not informed the plaintiff.  *Id*. ¶115.  Sanborn refused the plaintiff's request for the details of the incident, needed for the police report the plaintiff sought to file.  *Id*.

On September 26, 2014, the plaintiff's doctor kept her from returning to work because of her increased stress level.  *Id*. ¶ 116.  That winter and spring of 2015, the plaintiff met with the City and corresponded about her desire to return to work and requested further accommodations to keep her safe from SL, including mandatory training for management about stalking in the workplace.  *Id*. ¶ 117.  The City agreed to provide the training but did not do so.  *Id.*

On June 19, 2015, SL again approached the plaintiff at a public event and took pictures of the plaintiff and her family.  *Id*. ¶ 118.  The plaintiff informed the City and police about this incident.  *Id*.

Thereafter, SL posted about the event on Facebook.  In the post, SL wrote "this crazy bitch has had me arrested twice."  Complaint Exhibit A, ECF No. 1-1 at Page ID #34.  SL posted a video on Facebook, in which SL held a Taser gun and said "So, when a bitch fucks with me, this is what I do."  Complaint, ¶ 120.  Activating the Taser gun, SL uses phrases such as "a bitch," "the bitch," "crazy bitch," and "cunt."  *Id*.

As recently as February 2016, the plaintiff was again denied a promotion, and the position was filled by a woman less qualified than the plaintiff.  *Id.* ¶122.

### III.  Discussion

The plaintiff brings gender discrimination claims against the City of Portland under Title VII of the Civil Rights Act of 1964 ("Title VII") (Count I), and the Maine Human Rights Act ("MHRA") (Count II).  Complaint ¶¶ 124-140.  The plaintiff also brings claims of retaliation under

Title VII and the MHRA (Counts III and IV), a claim under the Maine Whistleblowers' Protection Act (Count V), and a claim pursuant to 42 U.S.C. § 1983 for violation of her federal constitutional rights to equal protection under the law (Count VI). *Id.* ¶¶ 141-164. The defendant does not seek dismissal of the plaintiff's claim of retaliation for exercising her rights under the First Amendment (Count VII) and of violations of the Maine wage and hour law (Count VIII). *Id.* ¶¶ 165-181; s*ee* Motion at 1.

### A. Count I: Title VII Gender Discrimination

The first count of the plaintiff's complaint alleges that, under Title VII, 42 U.S.C. § 2000e-2, the City of Portland discriminated against the plaintiff in the terms of her employment because of her gender, and that gender-based harassment created a hostile work environment.

#### 1. Gender-Based Discrimination

To establish a *prima facie* case of sex discrimination, a plaintiff must show: (1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) the position remained open or was filled by a person with similar qualifications. *See Kosereis v. Rhode Island*, 331 F.3d 207, 212-13 (1st Cir. 2003). At the *prima facie* stage of a case, "a plaintiff is not required to demonstrate in a disparate treatment case that [she] was treated differently than similarly situated employees who were not in the protected class." *Oakstone v. Postmaster General*, 332 F.Supp.2d 261, 274 (D. Me. 2004).

The plaintiff states that she was treated differently from men employed by the City of Portland during the course of her complaints about SL's behavior. In her Response to the Defendant's Motion to Dismiss ("Response") (ECF No. 7), she points to two such occasions. First, she notes that the City of Portland banned a person from City Hall after he made a post on Facebook regarding the City's Mayor and Manager, both of whom were men. Complaint ¶ 101. By contrast,

the plaintiff was in frequent communication with her managers and City officials regarding SL's behavior both in person and on Facebook, and on several occasions requested SL's banishment from City facilities. The plaintiff alleges that the City never instructed SL to stay away from the plaintiff, her office, or the buildings in which she worked. Further, the plaintiff asserts that she was passed over for a promotion for which she was qualified in favor of a man with less experience in the field. Complaint ¶ 105.

The defendant argues that the plaintiff admitted that she was not hired for one position in favor of a less-qualified man, and then later not hired for another position in favor of a less-qualified woman. Complaint ¶¶ 105, 122. Accordingly, the defendant argues, the plaintiff has only demonstrated that the City found her lacking for the jobs, and hired others irrespective of their, or the plaintiff's, gender. Defendant's Reply in Support of Its Motion to Dismiss Counts I through VI of Plaintiff's Complaint ("Reply") (ECF No. 10).

The plaintiff is a member of a protected group based on her gender, and her qualifications for the job she holds, and the jobs she applied for, have not been challenged by the defendant in its motion. Her factual assertions allege adverse employment actions. That she was not promoted to two different positions does not mean that she cannot show that on at least one of those occasions, where a less-qualified man was hired, she was discriminated against on the basis of sex. Additionally, her *prima facie* burden is sustained because she has alleged "[her] repeated complaints were ignored; whereas similar complaints from [male] workers have been promptly investigated and addressed." *Oakstone*, 332 F.Supp.2d at 274.

A motion to dismiss should only be granted where "it appears to a certainty that the plaintiff would be unable to recover under any set of facts." *State Street Bank and Trust Co. v. Denman Tire Corp.*, 240 F.3d 83, 87 (1st Cir. 2001). Indeed, a plaintiff's claim survives if, as stated, it is

"plausible on its face." *Iqbal*, 556 U.S. at 678. And, "[t]he plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (internal quotations omitted).

Under that standard, the plaintiff has alleged sufficient facts that would allow a finder of fact to determine that she could recover on a claim of sex discrimination. Accordingly, the defendant's motion to dismiss Count I of the plaintiff's complaint on sex discrimination grounds should be denied.

### 2. **Gender-Based Harassment**

The determination of whether a hostile work environment was created under Title VII "requires an assessment of the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Valentin-Almeyda v. Municipality of Aguadilla*, 447 F.3d 85, 94 (1st Cir. 2006) (internal quotations omitted). Importantly, "the elements of the test are intended to be sufficiently demanding ensure that Title VII does not become a general civility code." *Ferrante v. MAS Med. Staffing*, No. 2:13-cv-00211-JAW, 2015 WL 1401023 at *22 (D. Me. Mar. 26, 2015) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998)) (internal quotations omitted). Discrimination creates a hostile work environment "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create and abusive working environment . . . ." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (internal citations omitted).

The First Circuit requires that a plaintiff asserting a claim of a hostile work environment based on sexual harassment demonstrate:

(1) [T]hat she (or he) is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

*Crowley v. L.L. Bean, Inc*., 303 F.3d 387, 395 (1st Cir. 2002).

The defendant's motion to dismiss this claim in the plaintiff's complaint hinges upon whether the harassment was based upon sex. The defendant argues that the plaintiff has not established that factor. Rather, its motion states that the plaintiff alleged "only a *single* incident in which comments of an arguably sexual nature were made to the Plaintiff." Motion at 7 (emphasis in the original). The defendant specifically points out that SL did not make a sexual advance toward the plaintiff, nor make any physical contact. *Id*. Further, the defendant notes that SL's animus and harassment were also directed at the plaintiff's male partner, Chris, a fact that supports the conclusion that SL was not targeting the plaintiff because of her gender. *Id*. at 9. Finally, the defendant argues that SL's frequent use of the term "bitch" was not done in a gender-specific way, but rather as a neutral, derogatory word. *Id*. at 11.

The Supreme Court's decision in *Oncale v. Sundowner*, 523 U.S. 75 (1998), helped establish the contours of this field. There, the Court stated that in employer liability claims based on a hostile work environment sexual harassment claim, "Title VII does not prohibit all verbal . . . harassment in the workplace; it is directed only at discrimination because of . . . sex." *Id*. at 80 (emphasis in original) (internal quotations omitted).

Although this case involves a transgendered party, the principle remains the same, because as *Oncale* went on to state, the Court has "never held that workplace harassment, even harassment

between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations." *Id*. Rather, under Title VII, "[t]he critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id*. (internal quotations omitted).

Critically, the *Oncale* Court provided that whatever theory the plaintiff alleging sexual harassment chooses to pursue to establish the plaintiff's Title VII claim, "he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimination because of sex." *Id*. at 81 (internal quotations omitted). To determine whether the challenged conduct constitutes sexual harassment under Title VII, the allegations are viewed from the perspective of a reasonable person considering the totality of the circumstances. *See id*. at 82.

Despite this limitation, the First Circuit in *Forrest v. Brinker Int'l Payroll Co.*, 511 F.3d 225 (1st Cir. 2007), held that "the use of sexually degrading, gender-specific epithets, such as 'slut,' 'cunt,' 'whore,' and 'bitch,' with which [the plaintiff's co-worker] barraged [her] at work, has been consistently held to constitute harassment based upon sex." *Id*. at 229. Even more to the point, in surveying similar cases from other circuits, the court endorsed the notion that "vulgar and offensive epithets such as 'whore,' 'bitch' and 'curb side cunt' could establish a Title VII sexual harassment claim even though abuse may have been motivated by gender neutral reasons." *Id*. at 230 (quoting *Winsor v. Hinckley Dodge, Inc*., 79 F.3d 996, 1000-01 (10 Cir. 1996)). In support of this point, the opinion also cited approvingly another decision, stating that "a female worker need not be propositioned, touched offensively, or harassed by sexual innuendo' in order for a sexual harassment claim to lie and holding that names such as 'bitch,' 'slut,' and 'cunt' directed to female employee amounted to harassment based on her sex." *Id*. (quoting *Burns v. McGregor Electronic*

*Indus., Inc.*, 989 F.2d 959, 965 (8th Cir. 1993)).  *See also Crowley v. L.L. Bean, Inc*., 143 F.Supp.2d 38, 56 (D. Me. 2001) ("Words, in sexual harassment cases in particular, can take on very different meanings depending on how those words were communicated and the context in which they were communicated").

Here, the plaintiff has alleged that SL used derogatory terms of a gendered nature both in direct discussions with her (comparing the plaintiff to a former warden in SL's prison who was a "cunt"), and as a description of her on Facebook posts ("bitch," "that bitch").  Accordingly, she has established that words were used, even directed toward her, that had "sexual content [and sexual] connotations."  *Oncale*, 523 U.S. at 80.  And, while she has presented no evidence that indicates that SL's animus was directed to her *because* of her sex, only that sexually vulgar terms and gendered profanities were used, under *Forrest*, the use of such terms is sufficient to establish the plaintiff's Title VII sexual harassment claim at this early stage of the case.

That SL also contacted Chris on Facebook, stalked the house he shared with the plaintiff, or approached him and the plaintiff together at public events does not mean that SL was not targeting the plaintiff.  More importantly, it does not minimize the effect on the plaintiff of being subjected to SL's words on September 10, 2013, or of being the subject of SL's invective-laced Facebook posts on later dates.

Defendant points to *Foss v. Circuit City Stores Inc.*, 521 F.Supp.2d 99 (D. Me. 2007), in support of its argument.  In *Foss*, the court granted the defendant's Rule 12(b)(6) motion to dismiss the plaintiff's Title VII claim.  The plaintiff alleged sexual harassment had created a hostile workplace when, on multiple occasions, his manager made profane comments about others not present and discussed sexually explicit topics.  *Id*. at 107.  The court found that such allegations failed to establish that the plaintiff was harassed because of his sex, but rather, only that he had the

misfortune of being employed in an "undoubtedly . . . unpleasant place to work." *Id*. 109. The crucial distinction between *Foss* and the instant dispute is that, here, the plaintiff alleges that SL's vulgar terms were directed at her, not simply that she was exposed to them, as all others also present might have been. At a minimum, SL said that the plaintiff reminded SL of a former prison guard who was a "lying cunt," and later used social media to post statements that the plaintiff contends were directed at her, wherein SL refers to the target of SL's screed as a "bitch." Under the First Circuit's opinion in *Forrest*, that is enough to establish the plaintiff's claim at this early stage of the case, where all reasonable inferences are drawn in favor of the plaintiff.

Even with the First Circuit's pronouncements in *Forrest*, the plaintiff's cause of action for a hostile work environment based on sexual harassment is a close one, and the fine details of the conduct alleged by the plaintiff can often shift the outcome. For example, in *Hankey v. Town of Concord-Carlisle*, 136 F.Supp.3d 52, 67 (D. Mass. 2015), the district court found that the plaintiff's allegation that a group of fellow-students engaged in the single use of a gendered slur against her – the word "cunt" keyed into the side of her car – along with a significant number of other incidents, including smearing feces on her car and death threats written against her in multiple locations, was insufficient to establish her claim of gender-based discrimination.

However, *Hankey* is distinguishable in several key respects. First, the plaintiff's sexual harassment claim arose under Title IX, because the plaintiff was harassed by fellow-students at her high school. *Hankey*, 136 F.Supp.3d at 65. While the analysis of a sexual harassment claim under Title IX and Title VII are similar, the Supreme Court has cautioned that "schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable amongst adults." *Davis v. Monroe Cty. Bd. of Edu.*, 526 U.S. 629, 651 (1999). Second, the plaintiff in *Hankey* alleged a single use of a gendered term, "cunt," which was

carved into the plaintiff's car, whereas here, SL is alleged to have used that particular epithet on more than one occasion, in addition to referring to the plaintiff as a "bitch" on multiple occasions. Finally, *Hankey* was decided at the summary judgment stage, not as a motion for judgment on the pleading as here. *Hankey*, 136 F.Supp.3d at 56. The facts in *Hankey* had been developed through the discovery process and were tested at that pretrial juncture under a more rigorous standard "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for a trial." *Garside v. Osco Drug, Inc*., 895 F.2d 46, 50 (1st Cir. 1990) (quoting Fed. R. Civ. P. 56 advisory committee's note). Here, the court examines to see if the facts alleged plausibly support a claim, on that more forgiving standard.

As the court in *Hankey* noted, the First Circuit's decision in *Forrest* involved allegations of the repeated used of gendered epithets over the course of several months. *Hankey*, 136 F.Supp.3d at 66. On several occasions, the First Circuit has considered sexual harassment cases where the facts presented only a few instances of inappropriate conduct. Isolated incidents, "if egregious enough, suffice to evince a hostile work environment." *Noviello v. City of Boston*, 398 F.3d 76, 84 (1st Cir. 2005). Here, the plaintiff has alleged not a single incident, but an ongoing course of conduct that, based on SL's language and word choice, the plaintiff could have reasonably believed was based on her gender. In that regard, "[t]he accumulated effect of incidents can amount to a hostile work environment over time," *Kosereis* 331 F.3d at 216 (quoting *O'Rourke v. City of Providence*, 235 F.3d 713, 729 (1st Cir. 2001)).

Additionally, cases from other circuits with similar facts have reached upon similar reasoning the First Circuit's holding in *Forrest*. In *Chavez v. New Mexico*, 397 F.3d 826 (10th Cir. 2005), the court stated that "when a plaintiff introduces evidence of both gender-based and gender-neutral harassment, and when a jury, viewing the evidence in context, reasonably could

view all of the alleged harassing conduct . . . as the product of sex and gender hostility, then it is for the fact finder to decide whether such an inference should be drawn." *Id*. at 833 (internal quotations omitted). In another case, the Tenth Circuit, considering a Title VII claim, stated that even if some of the alleged conduct was not explicitly sexual in nature, "if it reasonably could be inferred that the conduct was related to gender or arose out of a context in which admittedly sex and gender-related conduct occurred, then it is for the fact finder to decide whether such an inference should be drawn." *O'Shea v. Yellow Tech. Services, Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999).

Equally instructive are those cases where a single or small number of incidents are found not to constitute a hostile work environment. *See e.g. Kosereis*, 331 F.3d at 216 (where the plaintiff, a Turkish-born Muslim, was called a "turkey" and teased about his lunch food did not constitute a hostile work environment); *Pomales v. Celulares Telefonica, Inc*., 447 F.3d 79, 83 (1st Cir. 2006) (plaintiff's supervisor's one-time sexual comment and gesture did not create severe and pervasive sexual harassment); *Ponte v. Steelcase, Inc*., 741 F.3d 310, 320-321 (1st Cir. 2014) (plaintiff's supervisor's placing of his hand on plaintiff's shoulder during two different car rides did not rise to the level of pervasive and egregious conduct).

While the plaintiff may yet have trouble establishing that her interactions with SL created a workplace "permeated with discriminatory intimidation, ridicule, and insult" such as to alter the conditions of her employment, *Harris.*, 510 U.S. at 21, that is a question for the finder of fact, or may present a challenge on a motion for summary judgment. Her allegations of the language and behavior of SL are sufficient at the pleadings stage of the case to meet the standard of the First Circuit's jurisprudence.

As noted previously, the gravamen of the defendant's argument rests on her contention that the plaintiff is unable to show that she was harassed because of her sex. Accordingly, I need not engage in a rigorous analysis of the other factors to establish a hostile work environment under *Crowley*, 303 F.3d at 395. Nevertheless, I do find that, at this early stage and taking all reasonable inferences in a light most favorable to the plaintiff, the plaintiff has established that her gender placed her in a protected class and that she was subject to unwelcome sexual harassment that, as discussed above, was because of her gender. Further, the plaintiff has alleged sufficient facts to show that SL's words and treatment were sufficiently severe and pervasive so as to alter the conditions of her employment and create an abusive work environment. Similarly, the plaintiff's allegations, if true, are sufficient to show that SL's conduct was both objectively and subjectively offensive, and, indeed, the plaintiff has sufficiently alleged she did perceive it to be hostile and abusive. Finally, the plaintiff has sufficiently alleged that the defendant's conduct in failing to appropriately respond to the plaintiff's numerous requests for assistance regarding SL's behavior could establish a basis for employer liability.

### B. Count II: Maine Human Rights Act Gender Discrimination

Count II of the plaintiff's complaint asserts a claim for gender discrimination under the MHRA, codified at 5 M.R.S.A. § 4572. The MHRA provides in relevant part, that "[i]t is unlawful employment discrimination . . . [f]or any employer to fail or refuse to hire or otherwise discriminate against any applicant for employment because of . . . sex . . . or, because of those reasons, to discharge an employee or discriminate with respect to . . . any matter . . . related to employment." The text and purpose of the MHRA is similar to Title VII. Indeed, federal courts have looked to federal case law addressing Title VII in evaluating claims arising under the MHRA. *See Morrison v. Carleton Woolen Mills, Inc.*, 108 F.3d 429, 463 n.3 (1st Cir. 1997) ("The Maine courts have

relied on the federal case law surrounding Title VII for the purpose of constructing and applying the provisions of the Maine Human Rights Act. We, therefore, apply the same legal standards in considering whether or not the evidence was sufficient to support determinations under both the state and federal statutes.") (citations omitted). Maine state courts have taken a similar approach. *See Maine Human Rights Commission v. City of Auburn*, 408 A.2d 1253, 1261 (Me. 1979) ("[T]he Maine legislature by adopting provisions that generally track the federal antidiscrimination statutes intended the courts to look to the federal case law to provide significant guidance in the construction of [the MHRA]") (internal quotations omitted).

Accordingly, the application of the facts of this case to the MHRA yields the same result as their application to Title VII, discussed above, for the plaintiff's claim of gender discrimination. As both the plaintiff's MHRA claim, and the text and purpose of the MHRA, are nearly identical to those of her Title VII claim, *compare* Complaint ¶¶ 125-31 *with id*. ¶¶ 133-40, and because the legal standard for evaluating the two claims are the same, the defendant's motion to dismiss the plaintiff's MHRA claim should similarly be denied.

### C. Counts III – IV: Retaliation Under Title VII and the Maine Human Rights Act

Under Counts III and IV of her complaint, the plaintiff alleges that the defendant engaged in illegal retaliation against her by placing her on unpaid leave and committing other acts of retribution upon her return because of her complaints of sexual harassment under Title VII and the MHRA.

Title VII retaliation law, codified at 42 U.S.C. § 2000e-3 states:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under this subchapter.

To assert a *prima facie* case of retaliation under Title VII, a plaintiff must show each of the following three elements: (1): she engaged in protected conduct; (2) she was thereafter subjected to an adverse employment action; and, (3) a causal connection existed between the protected conduct and the adverse action. *Che v. Mass. Bay Trans. Auth.*, 342 F.3d 31, 38 (1st Cir. 2003).

Similarly, retaliation under the MHRA is prohibited when an "individual has opposed any act or practice that is unlawful under [the MHRA] or because that individual made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under [the MHRA]." 5 M.R.S.A. § 4633(1).

The defendant argues that the plaintiff has not asserted an objectively reasonable belief under the circumstances that SL's treatment of her amounted to a Title VII violation on a theory of sexual harassment based upon gender. Motion at 16. In support of this argument, the defendant points out that under the facts presented, it was more reasonable to presume that SL's animosity, as manifested by stalking and harassing behavior, and by complaints to the plaintiff's employer about breaches of confidentiality and the dissemination of information about SL's sex offender status, was the cause of SL's displeasure; in short, that SL was motivated by the plaintiff's behavior, rather than the plaintiff's gender. *Id*. at 16-17. However, the defendant's argument overlooks the multiple occasions on which SL used derogatory gendered terms and sexually vulgar terms to, and about, the plaintiff.

Here, the plaintiff has asserted a reasonable subjective belief that she had been subjected to sex-based discrimination that would rise to the level of a Title VII and/or MHRA claim. She alleges that SL used derogatory and gendered terms directed to her, and in discussions about her that she later found out about. The plaintiff reasonably surmised that she was the target of SL's

animus, and the use of words like "cunt" and "bitch" in her presence or to describe her make it reasonable for her to think that she was being targeted because of her gender.

The plaintiff further alleges that she complained of her treatment by, interactions with, and fear of SL to her supervisors on numerous occasions over an extended period of time. Further, she alleges that she described the details of SL's ongoing conduct, and thus her employer was on notice of SL's use of gendered and sexual vulgarities. In addition, the plaintiff filed a complaint with the Maine Human Rights Commission and assisted in the subsequent investigation regarding her allegations of SL's behavior, and the subsequent action and inaction by the defendant. *See* Response at 10. These activities are clearly protected. *See Oakstone*, 332 F.Supp.2d at 268 (finding that the plaintiff's repeated complaints to management that his co-worker was preventing his career advancement in response to his declining her sexual advances, and his complaint that management's inaction in response amounted to an equal protection violation, was protected activity).

Over the course of the events that make up the plaintiff's complaint, the plaintiff alleges that she was, *inter alia*, denied an extra shift and the corresponding salary that had been promised to her; denied a promotion in favor of a male with less experience than the plaintiff; denied requested protection at the workplace from SL; and placed on an unpaid leave of absence. Thus, the plaintiff has alleged adverse employment action contemporaneous with the protected behavior. *See generally Ferrante*, 2015 WL 1401023, at *27.

Whether there exists a causal link, as the plaintiff asserts, or valid, independent reasons for the actions of the defendant is not a dispute to be settled now, for the plaintiff's allegations are sufficient, when viewed in the light most favorable to her as the non-moving party, to find that the defendant engaged in behavior that, "would allow, but not compel a reasonable jury to find that

[the plaintiff] was subjected to a retaliatory hostile work environment." *Id*. at *30. As noted above, on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a plaintiff's claim survives if, as stated, it is "plausible on its face." *Iqbal*, 556 U.S. at 678. The plaintiff's suggestion of a link between her complaints and requests and the defendant's treatment of her is plausible on its face.

Even if the plaintiff's first two counts in her complaint should be dismissed, a plaintiff's retaliation claim "may be viable even if the underlying discrimination claim is not." *Oakstone*, 332 F. Supp. 2d at 267-68. Further, "[t]he employment activity or practice that [the plaintiff] opposed need not be a Title VII violation so long as [the plaintiff] had a reasonable belief that it was and [she] communicated that belief to [her] employer in good faith." *Id*. at 268. Accordingly, the defendant's motion to dismiss Counts III and IV should be denied.

### D. Count V: Maine Whistleblowers' Protection Act

The plaintiff charges that because, while acting in good faith, she informed the defendant of SL's pattern of behavior and stalking and she believed that behavior to be a violation of the law, the adverse employment actions against her were a violation of her rights under the Maine Whistleblowers' Protection Act, codified at 26 M.R.S.A. § 833.

That law prohibits adverse action against an employee if the "employee, acting in good faith . . . reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule . . . ." 26 M.R.S.A. § 833(1). Further, the law "prohibits an employer from discharging an employee for reporting 'what the employee has reasonable cause to believe is a condition or practice that would put at risk the health or safety of employee or any other individual.'" *Levitt v. Sonardyne, Inc.*, 918 F. Supp. 2d 74, 84 (D. Me. 2013) (quoting 26 M.R.S.A. § 833(1)(B)). The law requires "an employee to prove that a

reasonable person might have believed that the employer was acting unlawfully." *Bard v. Bath Iron Works Corporation*, 590 A.2d 152, 155 (Me. 1991).

The defendant asserts that, as in the plaintiff's retaliation claims discussed above, the plaintiff's complaint failed to show that her belief that SL was targeting her for harassment because of her gender was an objectively reasonable one, and therefore, her claim to be a whistleblower subject to legal protection under the law is unsupported. Motion at 16. Further, in its Reply, the defendant notes that whistleblower protection is afforded under 26 M.R.S.A. § 833 only when the violation alleged is "committed or practiced by that employer." Reply at 7; *Costain v. Sunbury Primary Care, P.A.*, 2008 ME 142, ¶ 8, 954 A.2d 1051, 1054. Thus, the defendant alleges, the plaintiff is not entitled to whistleblower protection when the subject of her complaint is not her employer, but rather SL.

In response, the plaintiff argues that the complaint makes clear that numerous third parties raised concerns to the plaintiff, and others, that SL's behavior was inappropriate and potentially dangerous. Response at 12-13. Among other instances, the plaintiff points out that both the Westbrook Police Department and a local court found the plaintiff's concerns about SL's conduct sufficiently meritorious to investigate and arrest SL and to issue an order of protection in favor of the plaintiff, respectively. Response at 12.

The plaintiff's complaint under Count V makes clear that the basis of her whistleblower claim was that she had reported to the defendant, both orally and in writing, that "SL's continued harassment and stalking of her and her family constituted a safety risk to herself and others. She also believed this conduct to be a violation of the law." Complaint ¶ 152.

As noted above, there are sufficient facts alleged in the complaint to find that the plaintiff subjectively and objectively believed that she was the victim of SL's sexual harassment. Further,

the facts alleged throughout the complaint sufficiently demonstrate that the plaintiff had reasonable cause to believe that the conditions or practices of her employer would put her health or safety, and that of others, at risk.

The plaintiff alleges that she was the subject of SL's verbal harangue, campaign of stalking, and the topic of several public Facebook posts. Thus, the plaintiff has plausibly alleged, and indeed according to her complaint did report to her employer on numerous occasions, that she feared for the safety of herself and her family, as well as others who might attend group sessions. As a consequence, she requested that the defendant take protective measures, including banning SL from certain city facilities. She alleges that instead the defendant suspended her and sought to force her termination. Complaint, ¶¶ 154, 155.

The plaintiff's whistleblower claim is not directed at SL's misconduct but at the defendant's failure to respond appropriately to SL's behavior when the plaintiff complained of it to the defendant. Thus, under *Costain*, the plaintiff's claim survives, and the defendant's motion to dismiss this count should be denied.

### E. Count VI: Violation of Equal Protection

The plaintiff alleges that the defendant violated her rights to equal protection under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, and Article I, sections 4 and 6-A of the Maine Constitution. To establish these claims, the plaintiff must show that the defendant was acting under color of state law, and that its action or inaction amounted to a deliberate, callous, and reckless indifference to her constitutional rights, and that an affirmative link exists between such conduct and the constitutional violations that she alleges. *See Febus-Rodriguez v. Betancourt-Lebron*, 14 F.3d 87, 92 (1st Cir. 1994). The defendant rests its motion to dismiss on the argument that the plaintiff has failed to show that she was treated in a disparate

fashion by the defendant, and thus, there was no equal protection violation.[2]  Motion at 12-13.

Further, the defendant argues that under the requirements of her equal protection claim, the

plaintiff has failed to show that the City discriminated against her because the plaintiff's claim

rests on the alleged harassment of a third party, not a City employee.  Motion at 13.

The plaintiff does not respond to this portion of the defendant's motion. Nevertheless, the

First Circuit has held that "[i]f the merits are at issue, the mere fact that a motion to dismiss is

unopposed does not relieve the district court of the obligation to examine the complaint itself to

see whether it is formally sufficient to state a claim." *Vega-Encarnacion v. Babilonia*, 344 F.3d

37, 41 (1st Cir. 2003).

The defendant asserts that there is no authority for the plaintiff's proposition that where an

employee is subject to harassment perpetrated by a third party, an employer's failure to take

remedial measures rises to the level of a constitutional violation.  Motion at 14.  It is unclear that

that is the basis of the plaintiff's claim under Count VI, but even assuming that point of law to be

true, the plaintiff has stated a plausible claim that she suffered from discriminatory treatment by

the defendant as it pertained to her failure to be promoted in favor of a male with fewer

qualifications, Complaint ¶ 105, and that the City acted to protect male workers who were the

subject of online threats, harassment, or comments by banishing the alleged perpetrator, while it

failed to do so for the plaintiff, Complaint ¶ 101.

The defendant does point out that the plaintiff herself has listed behavior on the part of the

City that seems to contradict her claims of disparate treatment.  For example, in an attachment to

---

[2] The defendant does not argue that the plaintiff has failed to establish the more specific factors for municipal
liability. For example, the motion does not include argument on whether the plaintiff sufficiently pled that the
decisions at issue were made by those with "final policy making authority" within the City of Portland government
(*Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)), or whether a municipal custom or policy was the source
of the constitutional injury.  *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978).  Accordingly, they are not the
properly before the court on this motion.

her complaint, the plaintiff states that she "has also been told by other employees that there have been multiple occas[]ions when the City has issued No Trespass Orders on people in the community for a variety of reasons – one of which was when an employee reported that her husband was threatening her outside of work." Complaint Exhibit C, ECF No. 1-3, PageID #51.

To the extent that the defendant argues this alone disproves the plaintiff's claim of disparate treatment, I am not convinced. The plaintiff's allegation contained in the complaint pertains to an instance where an alleged harasser communicated via Facebook and faced banishment from City Hall to protect male city employees, a situation with striking similarity to the plaintiff's claim. That the city has banished others on other occasions, including those involving partners in a domestic relationship, does not undercut the plaintiff's claim on this point. It will of course be the plaintiff's burden to establish both that her treatment was so different as to establish a violation of her equal protection rights, and that the defendant acted under the color of law in doing so. At this stage of the case, however, the defendant's motion to dismiss Count VI should be denied.

## IV. Conclusion

For the foregoing reasons, I recommend that the court ***DENY*** the defendant's motion to dismiss Counts I through VI of the plaintiff's complaint.


### ***NOTICE***

***A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within fourteen (14) days after being served with a copy thereof. A responsive memorandum and any request for***

*oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.*

   *Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the district court and to appeal the district court's order.*


   Dated this 4th day of May, 2017.


                                        /s/  John H. Rich III
                                        John H. Rich III
                                        United States Magistrate Judge